May it please the Court, I'm Jane Creason and I represent Appellant. This case is about whether or not the ADA means anything, or if Concord can get by with the sort of institutionalized discrimination the ADA was enacted to prevent. Well, aren't the claims for injunctive relief completely moot with the death of, I guess it's your mother? They may be, but I believe there are other claims that are... Well, yeah, but they may be, they are. I mean, injunctive relief, that's moot, is it not? Yes. All right, so what's left? Claim for damages? Yes. And what's the intent that has to be there to generate a genuine issue of material fact for trial? The intent under the Title II Technical Assistance Manual and the ADA is there is no intent to discriminate under the ADA in order to obtain damages. And there is no intent to discriminate under Title II Technical Assistance Manual 2-9.2000. That was included in the 1994 supplement. It's in my appendix. You're saying that there's no intent requirement for compensatory damages? That's correct, Your Honor. And what would you have us look to to back that up? The Title II Technical Assistance Manual in the language of the ADA itself regarding damages. And what section of the ADA? It is to the section of the ADA. Sorry, I'll have that in a minute. Have you read Ferguson v. The City of Phoenix? I have. That seems to suggest that in order for there to be damages available, you've got to show some kind of a discriminatory animus or at least a deliberate indifference as compared to just bureaucratic entanglement and legal differences of opinion. And this says you've got to show some kind of intent or deliberate indifference. Would you agree with that that this case so requires? I agree the case requires it. I don't agree with the case. Well, you might not agree with the case, but it's binding precedent in the Ninth Circuit. Is it not? It is, Your Honor. Then what can we do? That's the law. We're stuck with it. It conflicts with the U.S. Department of Justice Title II Technical Assistance Manual and Chevron v. USA, which is in my opposition to summary judgment, says courts must give controlling weight to the Department of Justice's interpretation of a statute unless it is arbitrary, capricious, or manifestly contrary to the statute. That case was also followed in Tug, a federal case in Florida. And in the beginning of Ferguson, the court agreed with that. When they were evaluating whether there was the 911 space bar requirement, they looked at the Title II Technical Assistance Manual, and they said that the space bar requirement of Phoenix was clearly wrong. And then they applied the standard. At the bottom of page 673, they state that the DOJ interpretations of the statutes and its regulations were reasonable. In the first part of Phoenix, looking at the space bar, they applied the Title II Technical Assistance Manual. When they went to evaluate damages and the intent required, which was the main issue upon appeal, they wholly abandoned the Title II Technical Assistance Manual, and they went off into another analysis. But they never said at any time that they found the Department of Justice's Section 2-9.2000 to be capricious, arbitrary, or manifestly contrary to the statute. So I believe that when Congress authorized the Title II Technical Assistance Manual under 42 U.S.C. 12134A, that was Congress saying to the Department of Justice, make a manual and interpret the ADA, and it should be given controlling weight. And it was not when the Ferguson court got to the issue of damages. So you would have us write an opinion simply saying that that case is wrong? On that issue. Do you realize we can't do that? At least it has to go in bank for revisiting by the Ninth Circuit. Well, I'm here today. A three-judge panel doesn't have the authority, the power, the jurisdiction or anything else to just look at another case decided by the Ninth Circuit and say we don't agree with it, we're not following it. It has to be revisited in bank. Do you understand that? No. I do not. This is my first appeal. I'm here because this was my mother. For sure. I didn't choose to pursue appellate. That's the way it works. Okay. Then we can get to the merits of the case. Why wasn't it a reasonable accommodation to have the setback for 10 feet? Would not that have given your mother enough room in the front of the yard, if I understand the geography correctly? Justice O'Scallion, the fence was already set. The posts were installed on the lot line. And the Concord ordinance allowed for three feet. All I asked for was one more foot, and that was a very reasonable accommodation when 250 other houses in a two-mile radius of my neighborhood had four-foot fences, and they were not enforced. Were they nonconforming uses at the time the limitation was placed in the ordinance? There were some new houses and there were some old houses, and I'm not sure. The question was, were they nonconforming uses at the time the ordinance was adopted, or how do we know? You can have a new house behind a fence that has existed 100 years. Right? That's correct. And my point was simply there were 250 other houses with four-foot fences on the lot line, and I had a desperate need for one. They wanted to cut my yard in half, but that yard was the only thing my mother had left. They did not cut your legal title in half. They told you where you could build a fence within the lot limits of your property, right? Correct. Okay. They took nothing from you. They didn't give you a variance, right? Correct. Okay. So don't say they took anything away from you because you didn't have to begin with. Well, actually, the variance was initially granted. That's why I installed the fence. That's why we spent $12,000, $7,500 on a fence, another $2,500 to defend it. Let me ask you something. Are you qualified as an executor or a personal representative of your mother's estate? I am. Did you file under Rule 25 a substitution? I did. Okay. So are you the sole heir of the estate or is somebody else? I have a sister that's also an heir. Did you make some attempt to get the government agency to pay for your expenses that you incurred as a result of their erroneous statement to you that you should go ahead and build it? Yes, that is in exhibits. In the record, it's 8 or 9. During the city council hearing, I was told to file a government claim. When I did, they denied it completely. One of the issues in this case. Explain why. No. One of the issues in this case is whether or not my mother was harmed. The court wrote in its order. Your mother was not the owner of the property, right? You were. A living trust is the owner of the property. Who owns the fee simple equitable title in the property? A living trust. My mother's living trust. Your mother's. My mother's. She was the beneficiary of the trust. It was her property going in, right? It was her property. She put it in. You had no title interest in the property. I'm a beneficiary under the trust. My mother was a trust store. You were a beneficiary at the time the fence was being erected? Yes. You needed the fence for your use? We lived together. Yeah, but who owned the property? The trust, I know. But it was your mother's trust, not your trust. It was my mother's trust. It was your mother's property. You have no you put no consideration. You didn't buy the property. You didn't buy the property. It was my mother's. It's your mother's property. Property. And she had it in a trust. Yes. What happened in mediation? There was none. The city attorney canceled it because it's against their code. I wanted an ADA grievance procedure, but under Concord regulations, you are not entitled to have one if you file a government claim. When I went to the city council hearing, Mayor Hoffmeister said, and this is all in the record, it's around Excerpt 9 of the record, she said, you may file a government claim and recover your costs. I filed a government claim. They denied it completely. My mother spent $778 on a variance because she was told, I was told, that's what we had to do to get a reasonable modification. It was an illegal surcharge, and it was a harm. There's cases in the record in my opposition to summary judgment federal cases that disabled license placards when states charge fees for their actual costs could be $2 within Missouri. Some other cases were $5. When they charge a fee for their costs, it's an illegal surcharge, even if it's an actual cost. In this case, the initial variance was $595, and then after that I had to spend $60 on an appeal to the planning commission, $60 on an appeal to the city council. Each variance or the variance in the planning commission and the various appeals had notice requirements that amounted to $30 to $50. You had to have signs and post them. So I don't, I disagree with the district court's finding that there was no harm to my mother and that she had no claim on damages because there was no harm. The court said issues didn't have to be visited. $778 was a harm. It was an illegal surcharge, and my mother had standing. You were notified that you would be given a variance. Is that right? Yes. And you started building a fence? Correct. And then you were told, wrong, you can't build that fence. That was after we began installing it, correct. How much money were you out as a result of the erroneous notification of the variance? What did it cost you to build the fence? $7,500. But when I got the abatement order, when it was being installed, it was mailed nine days after it was dated. It told me I had one day to remove the fence, and the only thing I knew how to do because I did not practice real estate law is I hired a real estate attorney in Concord to help me, Stu Safin. Unfortunately, he did not understand civil rights. And so that was another $2,500. And without even talking about the money I spent to get this, we spent to get the accommodation, I think the main issue is that there was a surcharge of $778, and it violated the ADA. Counsel, why don't we hear from the city, and then you can just reserve the remaining seven and a half minutes that you have, and then we can hear from you again. May it please the Court. Mark, it sounds like hardball on the part of the city here. What's going on? I think if you listen to the appellant, it sounds like hardball, but I think, as with most cases, there's another side to the facts. Mrs. Creason was not, or Anna Creason, I should say, was not given a variant. She was given an over-the-counter fence approval based on the assumption that the fence would not violate the city's setback ordinance. After the city recognized that. Whose fault was that? I think that it was an absence of information provided by the applicant, so it was the applicant's fault, if any, rather than the city. After the misunderstanding was clarified, the city attempted to work with Mrs. Creason. Your Honors asked Jane Creason questions about settlement or mediation discussions. The city did enter into discussions with Mrs. Creason. However, the difficulty was the amount that she was seeking was well above what the city believed was realistically expended by her. What is the amount that the city believes was realistically expended by her? I believe it was an amount of approximately $5,000, which was the amount to put in the posts on the front of the property, and that would be required to remove those posts so that they were in a location complying with the fence setback ordinance. Is that offer still pending? No, it's not, Your Honor. I think that the heart of this case, Your Honors, is that in the six years since Mrs. Creason first contacted the city, she's never shown that the lot line fence that she wants was necessary to accommodate her disabled mother's needs, specifically her ability to enjoy her front yard, to sit on the porch with her dogs, to be able to interact with the neighborhood. As the district court appropriately recognized, a showing of necessity is essential for triggering a public agency's obligation to make an accommodation, whether judged under the FHA, FEHA, the ADA, or Section 504 of the Rehabilitation Act. The Justice Department's implementing regulations respecting the ADA, 28 CFR 35130B7, specifically states a public entity shall make reasonable modifications in its policies, practices, or procedures when the modifications are necessary to avoid discrimination. Similarly, the Title II Technical Assistance Manual, which counsel has referred to, conditions an obligation to grant an accommodation on a finding that discrimination will occur if the accommodation is not made. Did the mother personally have any contact with the city at all? She did not, Your Honor. So everything that the city heard was hearsay coming through her daughter, right? We reasonably relied on the representations of Jane Creason. We had no alternative. Was there an affidavit as the result of a hearing or an application signed under oath? As to what portion of the procedure, Your Honor? Any of the representations that were made to the city by a third party. No. I do not recall that there was ever anything affirmed under oath. It was simply a letter followed. Any testimony in the district court as to the dollar amounts of damages? I don't believe there was, Your Honor. I don't think the court reached that point. Anything under affidavit or copies of billings or anything submitted to the trial court? I believe that there may have been copies of billings. I'm not sure whether it's in this record, Your Honor. Back up for just a second and explain to me exactly what an over-the-counter approval of offense is. Yeah. What the conquered city's permit office does is that they have a streamlined permit procedure where if a request appears to not implicate substantial concerns on the part of the city, if it's a fairly small request, then that request can be reviewed on an ad hoc basis and approved the same day. It's an attempt by the city to streamline the permit process. The other side came in and asked for something involving offense and somebody that counterapproved it. That's correct. Is there any documentation that shows precisely what was asked for and why it was approved? Yes. There is documentation showing what was asked for. It's in the form of a letter from Jane Creason to the city. Is that in the record? It is, Your Honor. And I believe it's at page 1 of the city's – I believe it's at page 1 of the appellant's record, Your Honor. And it's just a letter? It is just a letter. It talks about the reasons why Jane Creason wanted an accommodation on her mother's behalf. It describes her mother's desire to interact with the neighborhood. But what was the form of the city's approval, just oral? Yes. That's streamlined all right. I take it back. Page 2 of the record is a July 17, 2000 letter, which one paragraph simply says this letter serves an approval of your request with stipulation as to the type of material. There's a letter approving it. Correct. I would point out to this Court, and it was not brief because it didn't come up in the district court, but the city – I will concede that the city erroneously granted or erroneously indicated to Ms. Creason that the fence was appropriate. That was a mistake on the part of the city. The city, however, has immunity under the California Civil Code for the erroneous granting or denial of a permit. I do not have the case citation or the citation to the Civil Code, and I would certainly be happy to provide Your Honors with that citation. Again, it didn't come up in the lower court. But that is one thing that I think should be taken into account. Additionally, there was discussion by counsel of representations by a certain city council member that Ms. Creason should – that the city should settle a case with Ms. Creason. Really, the representation was she should discuss the matter with the city attorney's office and at least broach the subject of trying to make the parties whole. That was done. It is not a case of the city playing hardball. You know, we made a mistake. You're wrong, but you lose. No problem. It was a case of the city recognizing that it had made a mistake, trying to rectify its wrongdoing, but running up against a party who simply was set on a particular amount. Did you make a dollar amount of settlement offer to the other side? I believe we did. I don't know the exact amount. I recall it was in the $5,000 range. So even though the city was not obligated to rectify its mistake, we did attempt to do so. So I guess your position is following the City of Phoenix case, there's no evidence to get past summary judgment of the kind of intent that's required by – That's absolutely the city's interpretation, Your Honor. Essentially, the appellant's brief has attempted to sidestep the whole necessity requirement, which to me is the linchpin of this case. I mean, without any showing of necessity, there can be no requirement that's ever triggered. In terms of – it appears that what the appellant has done is attempted to divert attention away from the necessity requirement and focus on alleged violations by the city of implementing regulations of the ADA, specifically 28 CFR 35107 and 106, which respectively require the city to provide a grievance procedure and also require the city to notify the public of its rights under the ADA. With respect to 35.106, there's no question that Ms. Creason, an attorney, was at all times well-versed in her rights under the ADA. A month prior to the time she even filed a variance request with the city, she had contacted disability rights advocates, which is an entity whose mission is the enforcement and education of the ADA. So it defies credibility to believe that Ms. Creason, who acted as her mother's representative and agent, wasn't at all times aware of the ADA. So even if one assumes arguendo that the city did not meet its notification rights under 35.106, there's no harm, there's no causation, and she doesn't have standing under Article III to pursue a claim. The same is true – Kennedy. Can she pursue it as a personal representative of the decedent's estate? I believe the same answer is true. I believe the answer is no, because there has to be some showing that there is a damage or a harm that has occurred as a result of the city's alleged violation. I take it that that's her status here, and she's also here because she's admitted to practice law in the Ninth Circuit. Correct. But just because she's the child of the mother, that's not why she's here. Well, I think the city's almost being faced with a two-edged sword. On the one hand, we're supposed to – the city's being asked to assume that it was communicating only with Anna Creason, who had Alzheimer's disease and never contacted the city. On the other hand, we're supposed to communicate with Jane Creason, who's representing her mother and who's serving as her mother's agent. So I think it's only fair that whether or not there was a damage should be judged in terms of whether Jane Creason understood her rights under the ADA. And I think clearly she did. I mean, there's no question that given her education as an attorney and her involvement with the Disability Rights Advocates Group, nobody could reasonably believe that she didn't know about the ADA. So there's no harm the city would maintain. As to the grievance procedure, there are no requirements. There are no – in Section 35.107 as to the method in which a grievance procedure should be published. The district court found as a matter of law that the city met the requirements because the grievance procedure is published in the municipal code, which is available to the public at the library. It's available at City Hall, and it's also available online. Ms. Creason has attempted – or the appellant has attempted to assert that she was wrongfully required to choose between pursuing her rights under the grievance procedure and litigation. That's not really the case. She could have deferred litigation, proceeded through the grievance procedure, and if she was unhappy with the remedies that it offered, then she could initiate litigation. So this is a false dilemma that has been created, which when one looks at the facts doesn't – Pursuing agreements would have suspended the running of any statute of limitations, what you're telling us? I'm not – no, I don't believe that it would have. But certainly the grievance procedure is speedy enough that I don't think that there would have been a statute issue. And certainly the city can itself stipulate to a suspension of the statute of limitations. It can enter into a stay agreement. Anything further? I will state in closing, Your Honor, that I think the statement in Gavin goes to the heart of this case, and that's the Gavin v. Springridge conservancy case, and that's cited in the city's brief, which is that the duty to make a reasonable accommodation does not simply spring from the fact that a handicapped or disabled person wants an accommodation made. There must be a showing of necessity. And in this case, as the Superior Court, when this case first started out, as the Superior Court judge said, look, it's like a difference in the placement of a window. What you want to do is be able to – is to be able to observe and to interact with the neighborhood. Moving the window a couple of feet either way is not going to make a difference to the person trying to view the neighborhood, but it's going to make a lot of a difference to the city, which is concerned about safety implications, pedestrians, lines of sight, and it's also concerned about the deleterious appearance of a lot line fence. It creates a fortress-like effect, which frankly harms the neighbors. And I think the city was legitimately concerned about that. So first of all, there's no showing of necessity. And then if you get into the balancing as to what the city's goals and objectives were, I think that clearly the city's decision was correct. Roberts. Thank you, counsel. Thank you, Your Honor. Ms. Griesen, you have some reserve time. Well, the first thing I want to – Please don't talk until you're on the mic because we're recording this. The first thing I want to address is some of the questions about the evidence. The accommodation letter is in the record. The approval of the request in writing is in the record. That's number two. And it says you may have your fence. If you build the fence, you say you're going to out of ornamental iron. Then they complain the cost was too much. So – Well, the other side says there really has never been a showing of necessity. It seems to me that what you were asking for, what your mother was asking for, was the ability to sit on the porch. Is that right? In the garage, actually. The porch is two feet by five feet. All right. But was the request in order to use the lawn space, or was that for the dogs? The request was to enable my mother to wander. She had a problem wandering. She couldn't watch television. She wanted to be outside all the time. I was trying to work part-time, and she wanted to wander. The California Health and Safety Code orders nursing homes to allow Alzheimer's patients to wander. They have to provide a safe area. Under the Health and Safety Code, it's five foot. That's why I asked for five foot. I didn't want six feet. I wanted to have some visibility in the yard and not feel like we were living in a fortress. How many square feet were you asking for, and how many square feet was the city willing to give you in order to permit this wandering? The lawn is 30 by 40. 30 by yards, feet, meters? Feet. Okay, 30 by 40. And they wanted me to move the fence back 12 1⁄2 feet, which happened to be where some trees were, the only trees in our front lawn. The necessity, because of the Alzheimer's. So would that be 30 by 26? No, it would have ended up being about 15 by 30. 15 by 30. And why wouldn't that be enough to allow your mother to wander? I believe that under the ADA, if a modification is reasonably necessary, and we're talking about the difference between a three-foot fence being allowed on the lawn, that a four-foot fence was reasonably necessary. My mother was also an avid horsewoman. She was born and raised in Kentucky, and she was 5'10". There was a history in the lower court record of her vaulting out of hospital beds. So a three-foot fence would have been unsafe. All I wanted was one more foot. I offered to the planning commission. Were you being allowed to have that one-foot higher fence just closer in, so you'd have a 15 by 30-foot area with a tall fence? I'm sorry. Would you? Well, you wanted a taller fence. Were they saying, you can build a taller fence, but it has to be closer in? Move it 12 1⁄2 feet back. They were going to give you 15 by 30, and you wanted 40 by 30? I wanted the front lawn, because that was... See, the point is, why was the whole front lawn necessary as compared to a smaller area? Because she was a gardener, because she'd lived there for 40 years, because the property was developed all the way to the lot line. She liked to pick dead roses off and camellias. She wanted to garden all day. Did she garden in the backyard? She could garden in the backyard. Yes, she did. But she wanted to be out in the front yard to watch people. Anything further, counsel? Yes, I would like to say that the city attorney has tried to say that I, because I was an attorney and I consulted disability rights advocates, that I had some sort of knowledge on the ADA and civil rights. There's absolutely no evidence of that in the record. Disability advocates primarily writes letters to stop discrimination in lawsuit. And I also want to say that under the Phoenix deliberate indifference standard, that there was, would have been found, intent to discriminate. They called animal control and reported my mother's dogs were running loose attacking people. The city attorney, not these gentlemen, but Kiko Kobayashi... Who's the they that reported your mother's dogs? The city of Concord. They made a false report. It's in the record. It's in the supplemental excerpt, in my supplemental excerpt of the record, the documentation from animal control that Concord called reporting my dogs were running loose attacking people. Now, the other thing they said was Kiko Kobayashi, and this is in the record also, called my mother's doctor twice. She violated her physician patient privilege. And when she called was not during the beginning... Time out. Who's Kiko Kobayashi? Deputy city attorney. And she was calling your mother to try to verify what? She called the doctor interviewing them on the intimate details of my mother's condition. And was that in connection with your statement that you needed this land in order to allow her to wander? Purportedly, just as truck, but not actually, because the variance was completed. It had been through the zoning administrator, it had been through the planning commission, and it was up on appeal to the city council when they called the doctor trying to find out if my mother really did or did not have Alzheimer's, where she actually lived. All they had to do was write me a letter telling me they needed an affidavit from me or from the nursing home. She lived with me four days a week in the nursing home three for a while. Then she came home full time in 2000 and the spring of 2001. But in 2000, I applied for it. And I want to say that calling a doctor by an attorney, calling a doctor to try to get details to defeat this accommodation was discrimination and it would have met the deliberate indifference standard, especially when a city attorney in the state of California is empowered to enforce the ADA. A city attorney is very different than the officials in the city of Phoenix. The Concord city attorney is supposed to enforce the ADA, has the power to file claims, and they were the ones that were doing the discriminating. Thank you, counsel. The case just argued will be submitted for decision, and we will hear argument. Oh, excuse me. Judge Beezer has a point. Counsel, this has nothing to do with a decision in the case, but it does have to do with your practice. I take it you're admitted to practice in the Ninth Circuit. I am. And you're familiar with our rules of court. Yes. And that I can expect your briefs to comply with the rules of court. Is that correct? Yes. In your reply brief, you have failed to comply with Rule 32-1, which requires a certificate. Are you familiar with the rule? I was at the time that I filed it. Did you put a certificate in your brief? Maybe not, Your Honor. My mother had died four weeks before I wrote that brief. I understand. If I violated a rule of court, I apologize. I have them. I just hope that you don't appear in this Court again with a rule violation. That's all. I don't like sanctions. I just use this as an educational opportunity for lawyers. And you violated the rule. I hope you comply in the future. Thank you. I will. Thank you. We will now hear argument in Ward v. Circus Circus Casino.
judges: Beezer, O'scannlain, Trott